**UNITED STATES of America,**
**Appellee,**

v.

**Harold GROSS, also known as Harry Gross, Defendant-Appellant.**

No. 303, Docket 26092.

United States Court of Appeals Second Circuit.

Argued March 4, 1960.

Decided April 6, 1960.

Certiorari Denied June 20, 1960.

See 80 S.Ct. 1602.

Joseph Balliro, Boston, Mass. (Balliro & Maktos, Boston, Mass., and Gaynor, Mosher, Freeman & Pisani, New Rochelle, N. Y., on the brief), for defendant-appellant.

John A. Guzzetta, Asst. U. S. Atty., New York City (S. Hazard Gillespie, Jr., U. S. Atty. for Southern Dist. of New York, Attorney; David R. Hyde, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Harold Gross appeals from a judgment of conviction on a six-count indictment entered in the District Court for the Southern District of New York after a jury trial. The indictment charged Gross with attempting to evade his income taxes for each of the years 1953 through 1958 by preparing and causing to be prepared and by filing and causing to be filed returns which understated his true income, in violation of § 145(b) of the Internal Revenue Code of 1939, as to 1953 and of § 7201 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7201, as to the later years.

Gross was employed during this period as the shipping foreman of the Neo-Gravure Printing Company, in Weehawken, New Jersey. His salary was paid by check; these payments were recorded on W-2 forms filed by Neo-Gravure with the government and were reported by Gross in his tax returns. However, the government claimed, and two officers of Neo-Gravure, Chenicek and Hillbrant, testified, that Gross had received an additional $29,000 in cash. This consisted of six annual payments of $4,000 for activities in preventing a feared work stoppage in connection with deliveries of the American Weekly to the New York Journal American, as a result of rivalry between the Teamsters' Union to which Neo-Gravure's drivers belonged and the Newspapers & Mail Deliverers' Union which represented the Journal American's, and two payments of $2,500 each in 1954 and 1955 for assisting Neo-Gravure in collective bargaining negotiations with Local 1730, International Longshoremen's Association, which represented its platform workers. Gross de-

nied receipt of these payments; none were included in his tax returns. These same payments had been the subject of inquiry by a Committee of the United States Senate chaired by Senator Mc-Clellan, Hearings Before the Select Committee on Improper Activities in the Labor or Management Field, 86th Cong., 1st Sess., pp. 18214–240, 18296–304.

Because of the issue of venue raised by Gross on this appeal, it becomes necessary to state how his tax returns were prepared and filed. In 1952 Gross requested Michael Pinto, an accountant having an office in the Southern District of New York, to prepare his income tax returns for 1951. Pinto asked for documentary evidence of Gross' income. Gross submitted his W–2 forms. Pinto could not recall whether Gross had submitted any other documents but "was satisfied that he submitted to me all the income that he had to report." For each of the years here in question, Pinto received similar information from Gross in Pinto's office in the Southern District. Pinto there prepared the returns in his own handwriting, signed them under the rubric "Preparer" (except for the 1953 return), and mailed them to Gross, who signed and filed them without change. Until the fall of 1958 Gross lived in Forest Hills, L. I., and the returns for 1953–1957 were filed in the Eastern District of New York; in October, 1958, he moved to Miami Beach and his 1958 return was filed in Florida. After Pinto had prepared the returns and sent them to Gross, "a truckdriver or somebody who seemed to look like a truckdriver" would come to Pinto's office with Pinto's fee. The government does not claim Pinto knew of Gross' alleged tax evasion.

After both sides had rested, defendant moved for a directed verdict of acquittal under Fed.R.Crim.Proc. 29, 18 U.S.C.A. The Court reserved decision. The jury found defendant guilty on all counts. Thereafter defendant renewed his motion for acquittal "on the ground that the evidence is insufficient to sustain a conviction of the offenses charged," for arrest of judgment under Fed.R.Crim.

Proc. 34 "on the ground that the court is without jurisdiction of the offense in that the offenses, and each of them, if any, were not committed in this district," and for a new trial under Fed.R.Crim. Proc. 33. All motions were denied. The court sentenced Gross to five years' imprisonment on each count, the sentences to run concurrently.

Gross contends the District Court erred in not granting his motions for acquittal and for arrest of judgment on the ground of improper venue; the government answers, *first*, that Gross waived any objection to venue and, *second*, that venue was properly laid in the Southern District in any event. We overrule the government's answer as to waiver but sustain its answer on the merits. Gross contends in the alternative that a new trial should be directed because of certain questions allowed to be asked him on cross-examination, and also because of what he claims to have been an improper answer by the Court to a question from the jury after the jury had begun its deliberations. We uphold the former contention and therefore do not reach the second.

■■■ We shall deal first with the government's claim that Gross waived any objection to venue in the Southern District by his delay in making this.

The claim would be well founded if this were a civil case, where the privilege as to venue "is of such a nature that it must be asserted at latest before the expiration of the period allotted for entering a general appearance and challenging the merits." Commercial Casualty Ins. Co. v. Consolidated Stone Co., 1929, 278 U.S. 177, 179–180, 49 S.Ct. 98, 99, 73 L.Ed. 252. However, no similar time limitation on the making of the objection exists in criminal cases where questions of venue "are not merely matters of formal legal procedure," United States v. Johnson, 1944, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236, but of constitutional right. As said by Judge Minton, as he then was, in United States v. Jones, 7 Cir., 1949, 174 F.2d 746, 748, "One of the things the Government has

the burden of proving is venue. It is an essential part of the Government's case. Without it, there can be no conviction. U.S.Const. Amend. VI \* \* \*," and further a "motion for acquittal made at the conclusion of all the evidence properly raised the question of venue." Accord, United States v. Browne, 7 Cir., 1955, 225 F.2d 751, 755.

The bundle of legal principles grouped under the term "waiver" thus has an exceedingly narrow application when a criminal defendant claims the government has failed to prove proper venue. Indeed, our opinions show rather that this is limited to what would be more accurately described as election, *i. e.*, to cases where the conduct of a defendant who has been put on notice that the government will not prove proper venue in the district of the indictment indicates that he is nevertheless willing to be tried there. We have found such an indication where lack of proper venue appeared on the face of the indictment (United States v. Jones, 2 Cir., 1947, 162 F.2d 72), and have said we might find it where lack of intention to prove proper venue appeared from statements by the government during the trial, see United States v. Michelson, 2 Cir., 165 F.2d 732, 734, affirmed 1948, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, or where defendant specified the grounds for a motion for acquittal but omitted mention of improper venue, see United States v. Brothman, 2 Cir., 1951, 191 F.2d 70, 73.

This was not such a case. The various counts of the indictment charged that "in the Southern District of New York, Harold Gross \* \* \* did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America \* \* \* by preparing and causing to be prepared and by filing and causing to be filed with the District Director of Internal Revenue at Brooklyn, New York [or in Count VI, at Jacksonville, Florida], a false and fraudulent joint income tax return \* \* \*" Since the indictment alleged that the returns had not only been prepared in but

filed from the Southern District, there was no basis for Gross' moving against it for improper venue, United States v. Albanese, 2 Cir., 224 F.2d 879, certiorari denied, 1955, 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753; he was entitled to await the government's case and to move when the government failed to prove that all the elements charged to have taken place in the Southern District in fact occurred there. United States v. Michelson, supra; United States v. Brothman, supra.

■■ The government supports venue in the Southern District under 18 U.S.C. § 3237, providing that "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued or completed." It relies on United States v. Albanese, supra, and United States v. Miller, 2 Cir., 246 F.2d 486, certiorari denied 1957, 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261, where venue was sustained under that section. Neither is decisive here. In Albanese, an income tax evasion case, everything save the actual receipt of the returns took place in the district where the defendants were charged; and in Miller, a false statement prosecution, the statements were made up and mailed in the district of the indictment, and only the receipt was elsewhere. Here, on the contrary, there was no evidence that Gross filed the returns from a place in the Southern District.

Nevertheless we believe venue was properly laid in that district. "By utilizing the doctrine of a continuing offense, Congress may \* \* \* provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates." United States v. Johnson, supra, 323 U.S. at page 275, 65 S.Ct. at page 250. The intent of Congress to avail itself of this prerogative was emphasized when, in the 1948 revision of the Criminal Code, four years after the Johnson decision, it al-

tered the language of what is now 18 U.S.C. § 3237, from that of the Judicial Code of 1911, ch. 231, § 42, 36 Stat. 1100, "begun in one district and completed in another," by adding the words "or committed in more than one district." The return is basic to Federal income taxation. As stated in § 601.602 of the Treasury Regulations, "All internal revenue taxes which are not collected by stamps are assessed and collected through the self-determination and self-application of the law and the regulations by taxpayers. The tax return forms are the instruments through which this is accomplished." The forms, prescribed in accordance with § 6011 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 6011, include a declaration by the preparer, if other than the taxpayer, under the penalties of perjury, that to the best of his knowledge the return is true, correct and complete based on all the information that he has.

The government's proof was that Gross sent incomplete and therefore untrue and incorrect information to the preparer in the Southern District; that the preparer thereupon prepared and attested returns in that district, which, while true on the basis of the information given him, were in fact false; and that he mailed them in the Southern District to Gross who then used them without change. This was enough to make the Southern District an "area through which force propelled by an offender operates." True no crime was "completed" in the Southern District. But it cannot be said the crime was neither "begun" nor "committed in part" there and was committed solely in a district where Gross and his wife simply signed and mailed the return and the Director received it.[1]

We come now to the matter which we believe requires a new trial. On cross-examination of Gross it was brought out that Gross had been present at the hearings before the McClellan Committee; that he had been sworn as a witness at these hearings; and that he had there heard Chenicek testify, in passages that were read to him from the Committee hearings, as to the same payments to him that were here at issue. The United States Attorney then asked, and the judge overruled an objection to, the following question:

"Q. Prior to your testimony here yesterday did you ever say to any Government investigator, or to the McClellan Committee that you did not tell Mr. Chenicek that in return for these $4,000 payments there would be no difficulties in the deliveries?"

Gross answered, "No, I never did." The same process, of objection, overruling and negative answer, occurred with two other questions:

"Q. Prior to your coming to court yesterday did you ever tell any Government investigator, or the McClellan Committee that you did not receive these payments?"

"Q. Prior to your testimony here yesterday have you ever told any Government investigator, or the McClellan Committee that you did not receive those payments of $2500 in 1954 and in 1955?"

The jury was reminded of this in the summation.[2]

We need not determine whether defendant's objections should have been sustained under the rule of relevancy that failure to deny the statements of others is admissible "only when no other

---

1. Under 18 U.S.C. § 3237(b), a defendant charged with income tax evasion outside the district where he resides may "elect to be tried in the district in which he was residing at the time the alleged offense was committed" by moving within 20 days after arraignment.

2. There was no evidence that Gross had been interviewed by an investigator.

3. Hearings Before the Select Committee on Improper Activities in the Labor or Management Field, 86th Cong., 1st Sess., pp. 18296–300, 18302–041.

explanation is equally consistent with silence; and there is always another possible explanation—namely, ignorance or dissent—unless the circumstances are such that a dissent would in ordinary experience have been expressed if the communication had not been correct." 4 Wigmore, Evidence, § 1071 (3d ed. 1940). For here another and more important principle is involved. The government knew there was "another possible explanation" of Gross' failure to deny Chenicek's statements before the McClellan Committee—Gross, when called as a witness there, had availed himself of the privilege against self-incrimination conferred upon him by the Fifth Amendment.[3] The course of questioning made it certain that this knowledge would not be limited to the prosecution. The government had brought out in cross-examination of Gross that he had been sworn at the McClellan Committee hearings, the questions were bound to elicit the answer that Gross had not there denied receipt of the payments, and the jury must have known the government would have placed in evidence any admission by him that he had received them. This left only one likely conclusion as to what had happened, and it would be altogether naive to suppose that a metropolitan jury, which had read of the extensive use of the privilege against self-incrimination made by witnesses before the Senate Committee, would not arrive at it. The questions thus accomplished the same result as if Gross had been asked whether he had asserted his constitutional privilege before the Committee, and we must consider them in that light.

We thus reach the issue whether direct questions on this subject would have been banned by the principles stated in Grunewald v. United States, 1957, 353 U.S. 391, 415–424, 77 S.Ct. 963, 1 L.Ed.2d 931. The government argues here, as it did there, that defendant's prior testimonial behavior was inconsistent with his later assertion of innocence and was therefore admissible to show his trial testimony to be incredible as a recent contrivance. The government could make a somewhat stronger case here than in Grunewald of inconsistency between Gross' denial of receipt of payments at the trial and his assertion before the Committee that testimony concerning them would tend to incriminate him. However, in United States v. Tomaiolo, 2 Cir., 1957, 249 F.2d 683, 690–692, we held it error to permit the prosecution to ask an important defense witness whether he had refused to testify before the grand jury, saying that "where a witness has a reasonable belief that he may be a defendant himself * * * it is perfectly consistent with innocence and with nonincriminatory answers to particular questions to refuse to answer any question at all." This was what Gross did before the McClellan Committee. Especially where, as here, the witness was the defendant himself, "the dangers of impermissible use of this evidence far outweighed whatever advantage the Government might have derived from it if properly used." 353 U.S. at page 424, 77 S.Ct. at page 984. The government does not succeed in avoiding this on the basis that the first references to the Committee hearings were made on the cross-examination of Chenicek and Hillbrant by defendant's counsel, which we find entirely proper, or that Gross' counsel had brought out on direct examination that Gross had first heard of the difficulties about shipments to the Journal American when he listened to the testimony of these witnesses at the hearings. The case would be different if Gross' counsel had asked him whether Gross had testified before the Committee and then endeavored to foreclose "the government on cross-examination from developing all the facts so that the partial account is not misleading." United States v. Sing Kee, 2 Cir., 250 F.2d 236, 240, certiorari denied 1958, 355 U.S. 954, 78 S.Ct. 538, 2 L.Ed.2d 530.

Gross also claims error in the overruling of an objection to a question asked on cross-examination whether "a new man who came on the payroll, or came on the staff there on the loading platform [would] have to make any payments of

822

money to get the job," to which he answered "Not that I know of." While we should not have considered any error in this ruling to require reversal, the relevancy of the question is not apparent to us, especially since, as the government stresses, "The question was carefully phrased not to suggest that Gross himself received any payments." We suggest that, in view of the possibly prejudicial effect of the question, it not be asked on a new trial unless this should become relevant on some ground not in the present record.

The judgment is reversed and a new trial ordered.