UNITED STATES of America, Appellant,

v.

Zvonko BUSIC et al.,
Defendants-Appellees.

No. 815, Docket 76–1552.

United States Court of Appeals,
Second Circuit.

Argued Jan. 14, 1977.

Decided Jan. 27, 1977.

Richard M. Cooper, Washington, D. C. (Edward Bennett Williams, Michael E. Tigar, Pierce H. O'Donnell and Williams, Connolly & Califano, Washington, D. C., of counsel), for defendant-appellee Zvonko Busic.

Jonathan J. Silbermann, New York City (William J. Gallagher and The Legal Aid Society, Federal Defender Services Unit, New York City), for defendant-appellee Julienne Busic.

Martin Elefant, Brooklyn, N. Y. and Paul B. Bergman, New York City, filed a brief for defendant-appellee Petar Matanic.

Nancy Rosner, New York City, filed a brief for defendant-appellee Mark Vlasic.

Edward R. Korman, Chief Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellant.

Before KAUFMAN, Chief Judge, and SMITH and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Prominent among the injuries inflicted upon the American colonists by King George III, according to the signers of the Declaration of Independence, was the despised practice of "transporting us beyond Seas to be tried for pretended offences."[1] This revulsion for adjudication of criminal charges in a remote region, before a jury drawn from a hostile or insouciant citizenry, was responsible for the codification of both Article III, section 2 and the Sixth Amendment to the Constitution. Today, when our vast country can be traversed in a matter of hours, these provisions stand as bulwarks against prosecutorial overreaching in forcing the defendant to answer accusations in a spatially distant and unfriendly environment. But two centuries have wrought changes in our society that have increased both the range of crimes that federal courts confront and the factors underlying the selection of the proper situs of trial. The instant case presents to us five alleged "skyjackers," a variety of malefactor of which the Founders never would have dreamed, and requires us to determine whether it is impermissible to try them in the Eastern District of New York, which embraces the busy airport at which they boarded the airplane they are charged with hijacking and is part of the major metropolitan area in which they reside and effected significant steps toward the ultimate commission of their crime. We believe that trial in that District is proper under the Air Piracy Act, and accords with the relevant constitutional policy. Accordingly, we reverse the order of the district court that dismissed on the basis of improper venue the substantive counts of the indictment, and remand the case for trial.

I. FACTS

To the limited end of presenting the legal issue for this appeal, the parties have stipulated to the validity of a factual statement drawn from various Government affidavits introduced before the district court. While we must accept the truth of these assertions for this purpose, we wish emphatically to stress that our opinion should not be construed as an expression of views on the merits of the prosecution.

Zvonko and Julienne Busic, Petar Matanic, Frane Pesut and Mark Vlasic were indicted for the September 10, 1976 hijacking of TWA Flight 355, which was scheduled to fly from LaGuardia Airport in New York City to Chicago. During the preceding several days, pursuant to a carefully devised plan, appellee Zvonko Busic had supplied false names when purchasing five tickets for the flight at various locations in New York City, including LaGuardia Airport. Prior to embarkation he placed a powerful explosive device in a Grand Central Station locker and discarded the key in the Hudson River. The appellees boarded the aircraft with a previously prepared typewritten hijack note and several cast iron pots, which escaped confiscation by security personnel because of an ingenious ruse. By wrapping them with gift paper and ribbons, the appellees convinced the operators of the airport's metal detection devices that the pots were presents for acquaintances. In addition, prior to boarding the appellees had prepared several imitation dynamite sticks by wrapping a quantity of putty in black tape commonly used by electricians. They

---

1. H. Commager, Documents of American History 101 (8 ed. 1968).

also had filled their luggage with political pamphlets which they intended to scatter widely by throwing them out of the aircraft as it flew over several European cities.

These were the largely unknown background facts as they existed when the flight crew closed the doors of TWA Flight 355. Shortly thereafter, but before the airplane left the ground, a passenger attempted to use a lavatory in the rear of the cabin. Prior to reaching his destination, however, he confronted Vlasic, who was blocking the aisle. Drawing the passenger's attention to a large leather bag at his feet, Vlasic uttered the following command: "Stop, do not use the lavatory, there are three bombs in this bag. This is a hijack, return to your seat." The passenger complied.

The import of Vlasic's statement was clear and correct. Scant moments later, at an undetermined point beyond the boundaries of the Eastern District of New York,[2] Zvonko Busic handed a note to a flight attendant for transmittal to the pilot. It read:

1. This airplane is hijacked.

2. We are in possession of five gelignite bombs, four of which are set up in cast iron pans, giving them the same kind of force as a giant grenade.

3. In addition, we have left the same kind of bomb in a locker across from the Commodore Hotel on 42nd Street. To find the locker, take the subway entrance by the Bowery Savings Bank. After passing through the token booth, there are three windows belonging to the bank. To the left of these windows are the lockers. The number of the locker is 5713.

4. Further instructions are contained in a letter inside this locker. The bomb can only be activated by pressing the switch to which it is attached, but caution is suggested.

5. The appropriate authorities should be notified from the plane immediately.

6. The plane will ultimately be heading in the direction of London, England.

Two to six minutes later, when the aircraft was in the vicinity of Buffalo, New York, the pilot received the message. By this time Busic, who had transformed the iron pots into imitation bombs in the lavatory, appeared in the cockpit and opened his jacket to reveal a "dynamite vest," which he threatened to detonate if his demands were not met. The pilot, pursuant to the hijacker's orders, flew the airplane first to Montreal and then to Gander, Newfoundland where 33 hostages were released prior to a transatlantic voyage. The hijackers eventually surrendered in Paris.

Authorities in New York, meanwhile, descended upon the locker in Grand Central Station referred to in the hijacking message and which contained the authentic explosive device planted by Busic as well as a list of demands. Following the instructions concerning publication set forth in the note, the New York Times, Washington Post, Chicago Tribune, Los Angeles Times and International Herald Tribune proceeded to afford prominent coverage in their morning editions to a Croatian "Appeal to the American People." Tragically, New York City police officer Brian Murray was killed while attempting to defuse the Grand Central bomb.[3] Upon his return to New York, Zvonko Busic is alleged to have said: "We are proud of what we did. Don't be surprised if you hear about other attacks in the future. We are defending a just cause, yet we are with handcuffs on our wrists."

## II. PROCEEDINGS BELOW

The grand jury charged the two Busics, Matanic, Pesut and Vlasic with two counts of air piracy, which are identical except that the first also alleges that the commission of the offense resulted in the death of

2. While the precise route of the aircraft cannot be determined, the Government claims that the note was presented to the flight attendant in the airspace over northwestern New Jersey or northeastern Pennsylvania.

3. The appellees currently are charged with second degree murder in New York County as a result of this incident.

officer Murray, 49 U.S.C. § 1472(i)(2),[4] and conspiracy, 18 U.S.C. § 371. The appellees moved to dismiss the substantive counts of the indictment[5] because, they argued, venue was improper in the Eastern District. Judge Bartels granted the motion on November 22, 1976 and the Government appealed.

Judge Bartels was aware, as he stated in his opinion, that "none of the defendants and none of the witnesses will have anything more than a fortuitous connection with any district over which the plane flew other than the Eastern District of New York and its surrounding metropolitan area." Moreover, he realized that "the most logical place for air piracy cases to be tried would be in the district where defendants boarded the aircraft." He stressed that the appellees "conspired, prepared to commit the offense, had the intent to commit the crime and boarded the plane in this district." Nevertheless, he said they had not seized and exercised actual control over the aircraft before it had entered the airspace of the Western District of New York. And he reasoned that although 49 U.S.C. § 1473(a)[6] authorized the laying of venue in, inter alia, any district where the offense of air piracy had "begun," the acts here had not reached that stage "where the preparations have progressed to the first steps toward the commission of the crime, such as the first contact with the aircraft personnel notifying them of the intention to hijack" prior to the airplane's passing the boundaries of the Eastern District. Thus he concluded that under the relevant statutory provision venue clearly was improper in Brooklyn. We disagree and believe that the appellees plainly are triable in the place where the crime had "begun," the Eastern District of New York.

## III. DISCUSSION

The Constitution and 49 U.S.C. § 1473(a) establish the parameters for our consideration of the instant appeal. Article III, sec-

---

4. **Aircraft piracy**

(i)(1) Whoever commits or attempts to commit aircraft piracy, as herein defined, shall be punished—
(A) by imprisonment for not less than 20 years; or
(B) if the death of another person results from the commission or attempted commission of the offense, by death or by imprisonment for life.
(2) As used in this subsection, the term "aircraft piracy" means any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States.
(3) An attempt to commit aircraft piracy shall be within the special aircraft jurisdiction of the United States even though the aircraft is not in flight at the time of such attempt if the aircraft would have been within the special aircraft jurisdiction of the United States had the offense of aircraft piracy been completed.
49 U.S.C. § 1472.
An aircraft is "in flight"
. . . from the moment when all external doors are closed following embarkation until the moment when one such door is opened for disembarkation or in the case of a forced landing, until the competent authorities take over the responsibility for the aircraft and for the persons and property aboard.
49 U.S.C. § 1301(34).

5. It is conceded that venue for the conspiracy count is proper in the Eastern District of New York, where several overt acts occurred. *Hyde v. U. S.*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).

6. The trial of any offense under this chapter shall be in the district in which such offense is committed; or, if the offense is committed out of the jurisdiction of any particular State or district, the trial shall be in the district where the offender, or any one of two or more joint offenders, is arrested or is first brought. If such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one or two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia. Whenever the offense is begun in one jurisdiction and completed in another, or committed in more than one jurisdiction, it may be dealt with, inquired of, tried, determined, and punished in any jurisdiction in which such offense was begun, continued, or completed, in the same manner as if the offense had been actually and wholly committed therein.
49 U.S.C. § 1473(a).

tion 2 provides that trials "shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." The Sixth Amendment, adopted after the Judiciary Act of 1789 divided the states into federal judicial districts, speaks similarly: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ." In cases of air piracy, Congress by special statute has determined that

> Whenever the offense is begun in one jurisdiction and completed in another, or committed in more than one jurisdiction, it may be dealt with, inquired of, tried, determined, and punished in any jurisdiction in which such offense was begun, continued, or completed, in the same manner as if the offense had been actually or wholly committed therein. 49 U.S.C. § 1473(a).

The appellees contend that the facts presented here make § 1473(a) susceptible to only one narrow constitutional reading, which would advance the moment of beginning so near the point of consummation of the crime that the words might as well be read as synonymous and without any significant statutory difference. They argue that the essence of the crime of air piracy, according to the language in the Act, is the intentional and forcible "seizure or exercise of control" of an aircraft. Thus the offense charged here cannot be committed until

there is a transfer of control from pilot to hijacker. This, they say, did not occur until the airplane was flying over Buffalo. Moreover, they claim that the requisite transfer of control had not "begun" until Busic gave his threatening note to a member of the flight crew who then transmitted it to the captain. This event transpired, they argue, after the aircraft left the Eastern District and thus, the appellees are not triable there since all of their conduct prior to the precise moment when the hijack note was passed constituted "mere preparation" rather than a "beginning" of the crime.

■ We do not think that this tortured and hyperconstricted reading of the statute is warranted. Congress responded to a national epidemic of hijackings by making air piracy a federal crime. A major benefit of this action, according to the Report of the House Committee on Interstate and Foreign Commerce, was the expected alleviation of the insuperable difficulties that law enforcement officials encountered in determining the exact state and county in which the seizure of an aircraft occurred. Recent airborne crimes had dramatically underscored gaps in existing laws that provided suspects with a haven from prosecution.[7] 1961 U.S.Code Cong. & Adm. News pp. 2563–2566. Any rational construction of § 1473(a) must account for Congress's special concern to permit a just and convenient locus for prosecution of this most unique crime which can begin and continue to be committed over several states in this high speed jet travel age in a matter of minutes. Accordingly, it appears—and the appellees do not seriously dispute—that Congress intended the Government to enjoy the broad-

7. For example, in describing the history of the Air Piracy Act, the House Committee stated that the assault on an airline captain during a July 8, 1960 nonstop flight from Chicago to Los Angeles, which could not be prosecuted because of problems of jurisdiction, "resulted in an acceleration of efforts to plug loopholes in existing laws affecting air commerce and in the introduction of legislation to extend Federal jurisdiction into areas which are not satisfactorily covered by State laws due to the nature of modern aircraft flights." 1961 U.S. Code Cong. & Adm. News p. 2566. Congress later amend-

ed the concept of when an aircraft is "in flight" to include a lengthier period of time before take off in response to a case that severely restricted the conditions under which an individual could be charged with attempted air piracy despite his "obvious intent to hijack the aircraft and the danger posed to both the aircraft and its passengers . . ." 1974 U.S. Code Cong. & Adm. News pp. 3979–80. This is indicative of Congress's concern to afford a rational scope for prosecution of suspected hijackers with a minimum of technical barriers.

est possible choice of venue within constitutional bounds.[8]

The facts of this case bear eloquent testimony to the fact that the crime of hijacking had begun in the Eastern District of New York. Essential to the success of the appellees' scheme was their ability to board the aircraft with the cast iron pots and imitation dynamite sticks. Their goal was accomplished through an ingeniously conceived stratagem designed to circumvent the suspicion of airport security personnel. Busic purchased tickets for the flight at LaGuardia and elsewhere through the use of fictitious names. He planted a bomb in a locker at Grand Central Terminal with a list of demands. The appellees also filled their luggage with Croatian freedom pamphlets for ultimate distribution in European cities. Once aboard the airplane, and before it left the ground, Vlasic obstructed access to the lavatory (into which Busic went to construct his imitation explosive devices) and announced, "This is a hijack." In short, every one of the appellees' acts prior to the actual transmittal of the typewritten note was unambiguously corroborative of their unequivocal intention to hijack Flight 355.[9] Under these circumstances it is obvious to us that 49 U.S.C. § 1473(a) serves its purpose well and intelligently by permitting prosecution in the Eastern District of New York.

It is equally clear to us that this result does not violate any constitutional rights of the appellees. Although Article III, section 2 concerns venue (place of trial) and the Sixth Amendment vicinage (residence of petit jurors), both can be traced to the ancient historical fact that at one time jurors decided cases on the basis of personal knowledge, see 3 Blackstone, Commentaries *359–60; 1 Coke On Littleton 125 (1853), and were drawn from the vicinity of the crime. See Blume, *The Place of Trial of Criminal Cases*, 43 Mich.L.Rev. 59, 60–63; Comment, 115 U.Pa.L.Rev. 399, 405–07 (1967). An even more significant source of these constitutional standards, however, can be discerned in the vigorous reaction of the American colonists evoked by Parliament's provision that trials of individuals accused of treason in Massachusetts be conducted in England. The Virginia Resolves responded to that edict by declaring: "thereby the inestimable Privilege of being tried by a Jury from the Vicinage, as well as the Liberty of summoning and producing Witnesses on such Trial, will be taken away from the Party accused." Journals of the House of Burgesses of Virginia, 1766–1769, at 214 (Kennedy ed. 1906).[10]

8. Of course, if the Government chooses to prosecute in a place that the defendant considers *remote or inhospitable*, Rule 21(b), F.R.Crim.P., permits transfer of venue, upon motion of the defendant, "for the convenience of parties and witnesses, and in the interest of justice . . ." Presumably the appellees could have invoked this provision if, for example, the aircraft after seizure in Buffalo continued on its journey over Ohio, Michigan or Indiana, in the seized posture, and the Government chose one of these more remote states as the place to prosecute.

9. Since the substantive crime was consummated, the appellees clearly could not have been prosecuted for "attempted" air piracy. Nevertheless, an analysis of the appellees' conduct in terms of whether they would have been guilty of an inchoate crime had their plans failed to materialize provides some insight into whether commission of the actual offense had begun. The considerations, however, are not analogous. Judicial inquiry into whether a defendant is chargeable with an attempt is necessarily predictive and focuses on the point when the accused's conduct has progressed sufficiently to minimize the risk of an unfair conviction. See *U. S. v. Stallworth*, 543 F.2d 1038 (2d Cir. 1976). For purposes of determining proper venue, on the other hand, we are merely called upon to ascertain in which jurisdiction it is just to try a defendant for an offense that by hypothesis has been carried to fruition. The terminology of the law of attempt is therefore useful, but the basic considerations inapplicable. Where, as in the instant case, the accused's purposeful conduct bespeaks so eloquently the beginning of a crime, it is neither necessary nor appropriate to speculate whether he properly could have been convicted of an attempt.

10. The Resolves were approved on May 16, 1769. On the following day an address to the King was passed, which lamented:

For, how truly deplorable must be the Case of a wretched American, who, having incurred the Displeasure of any one in Power, is dragged from his native Home, and his dearest domestick Connections, thrown into

The Framers' mandate for trial in the vicinity of the crime was meant to be a safeguard against the injustice and hardship involved when the accused was prosecuted in a place remote from his home and acquaintances. Indeed, the appellees in this case urge us to enforce this privilege, and cite to us Justice Frankfurter's oft-repeated language in *United States v. Johnson*, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944):

> If an enactment of Congress equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be disrespected, construction should go in the direction of constitutional policy even though not commanded by it.

Of course, the appellees would have us hold that the "vicinage" contemplated by the Founders and Justice Frankfurter forbade the Government, in this instance, from proceeding in the Eastern District and mandated that it prosecute in Buffalo, a city whose only contact with this case is the mere fortuity of being five miles below the speeding jet airplane that the appellees had just hijacked. We cannot perceive any justification in the Constitution for such a result.

We do not believe that the appellees' blind insistence that the dictionary meaning of the term "seizure" mechanically govern our interpretation of "begun" is warranted. Congress did not direct its statute to an abstract world of Platonic forms, but to the real world of action. We are compelled, therefore, to reject the appellees' attempt,

by their crabbed construction of the term "begun," to fasten upon the federal Air Piracy Act the precise over-technicality that Congress explicitly wished to avoid. The many purposeful and unambiguous acts of the appellees in the Eastern District clearly support our determination that the crime of hijacking had begun there within the intent of Congress. It is incomprehensible to us that courts must conduct a potentially fruitless search to determine exactly where a crime is committed when the alleged perpetrators are traveling at 600 m. p. h. In the case before us the note was passed in New Jersey or Pennsylvania, but Busic first confronted the pilot in western New York State. If the steward had tripped, Busic may not have reached his destination until the aircraft passed over Ohio, or was speeding over the middle of Lake Erie. And since the appellees concede that the Government could indict and try them at any point over which the jet flew after leaving the Buffalo airspace, we are hard pressed to accept the validity of the argument that constitutional restrictions on prosecutorial discretion preclude trying this case in the Eastern District of New York, which Judge Bartels correctly recognized as the sensible one, but instead permit prosecution in other districts over which the aircraft chanced to fly after seizure, no matter how fortuitous the contact.

■ Finally, we believe that the extensive case law under 18 U.S.C. § 3237(a),[11] the venue provision for so-called continuous crimes after which 49 U.S.C. § 1473(a) was modeled, supports, to the extent that it is

---

Prison, not to await his Trial before a Court, Jury, or Judges, from a Knowledge of whom he is encouraged to hope for speedy Justice; but to exchange his Imprisonment in his own Country, for Fetters amongst Strangers? Conveyed to a distant Land, where no Friend, no Relation, will alleviate his Distresses, or minister to his Necessities; and where no Witness can be found to testify his Innocence; shunned by the reputable and honest, and consigned to the Society and Converse of the wretched and the abandoned; he can only pray that he may soon end his Misery with his life."

Journals of the House of Burgesses of Virginia, 1766–1769, at 216 (Kennedy ed. 1906).

11. Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves.

18 U.S.C. § 3237(a).

relevant, the result we have reached. Generally applicable to mobile offenses other than air piracy, section 3237 requires an initial judicial inquiry into whether a particular crime involves a single act or movement. If the court determines, after considering the nature of the offense and the legislative and constitutional policies, *see United States v. Anderson*, 328 U.S. 699, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946), that it requires only a single act, then the prosecution must proceed in the district where the crime was committed *in toto*; if the crime, however, involves a continuous course of conduct, the offense may be tried wherever it was "begun, continued or completed." Since the appellees concede, as they must, that hijacking is by its very nature a continuous crime, the many cases that limit prosecution to the solitary district in which the offense was "committed," and abjure conducting the trial where mere preparatory acts took place, are clearly distinguishable. See *Travis v. United States*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961) (non-Communist affidavit "on file" in Washington, D.C.); *United States v. Bozza*, 365 F.2d 206 (2d Cir. 1966) ("receiving" stolen government property); *United States v. Walden*, 464 F.2d 1015 (4th Cir. 1972), *cert. denied*, 409 U.S. 867, 93 S.Ct. 165, 34 L.Ed.2d 116 and 410 U.S. 969, 93 S.Ct. 1436, 35 L.Ed.2d 705 (1973) (illegal "entry" of bank); *United States v. Sweig*, 316 F.Supp. 1148 (S.D.N.Y.1970) (illegally "acting" as agent of private person to defraud United States).

■ The proper focus of our inquiry, rather, is upon cases such as *United States v. Cashin*, 281 F.2d 669 (2d Cir. 1960) in which this court realized that the crime of use of the mails to facilitate a fraudulent scheme in violation of the Securities Act was begun in Alabama where "most of the acts necessary to [the] execution" of the crime occurred, although the alleged mailing took place in New York. *Id.* at 674. *See also United States v. Gross*, 276 F.2d 816 (2d Cir.), *cert. denied*, 363 U.S. 831, 80 S.Ct. 1602, 4 L.Ed.2d 1525 (1960). The principle that is gleaned from these cases is that when the nature of the offense defies the notion that it was committed in a single district Congress may, within constitutional norms, fix venue wherever sufficient purposeful acts occurred. *See United States v. Cores*, 356 U.S. 405, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958); *Armour Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908). In the case before us involving hijacking, a crime which Congress considered sufficiently unique to require its own special venue provision, we conclude that the appellees' alleged acts in the Eastern District of New York easily surpassed this behavioral threshold.

Because of our disposition of this appeal, we need not consider the Government's other ground justifying venue in the Eastern District—that the appellees were "arrested or . . . first brought" there.

The order of the district court is reversed and the case remanded for trial.