UNITED STATES of America, Appellee,

v.

**Patrick ROONEY, Appellant.**

**No. 321, Docket 88–1250.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 4, 1988.
Decided Jan. 10, 1989.

Judd Burstein, New York City (Michael R. Gavenchak, Ruth M. Liebesman, Ilisa T. Fleischer, Law Student, of counsel), for appellant.

Baruch Weiss, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Celia Goldwag Barenholtz, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES and NEWMAN, Circuit Judges, and MUKASEY, District Judge.[*]

OAKES, Circuit Judge:

This case involves a tawdry, though profitable, tax fraud scheme involving gifts to charity. The charity accepted checks from "contributors" and returned to them cash equal to 90% of the face amount of each check. The contributors then claimed a charitable deduction for the full amount of the check, and the charity kept its 10% cut. The charity profited by 10% of the face amount of the gifts, and the contributors profited by taking unlawful tax deductions for the other 90%.

Patrick Rooney contributed to this scheme through his corporation in 1980 and personally in 1983, and he profited at the expense of the internal revenue. He was convicted of two counts in a three-count superseding indictment. The first count charged conspiracy with a branch of the charity, the second count (on which he was acquitted [1]) charged tax evasion, and the third count charged the filing of a false statement (regarding his charitable contributions) on his 1983 joint tax return. Rooney was sentenced in the United States District Court for the Southern District of New York, Louis L. Stanton, Judge, to four

---

[*] Hon. Michael B. Mukasey of the United States District Court for the Southern District of New York, sitting by designation.

1. Judge Stanton instructed the jury that they had to find that Rooney owed substantially more tax than he paid in 1983 to find him guilty of tax evasion, and Rooney introduced evidence of bona fide deductions that he inadvertently failed to take that would have offset his tax liability for the Leavitt–Toonkel deduction.

months' imprisonment on the false statement count. Judge Stanton suspended imposition of sentence on the conspiracy count, placed Rooney on probation for a term of three years, and ordered him to pay a $50,000 fine and to perform 300 hours of community service.

On appeal, Rooney argues that the evidence was insufficient to prove venue on the false statement count and that the trial court erred in taking the issue of venue away from the jury; that there was a fatal variance between the single conspiracy alleged in the indictment and the proof, which he claims demonstrated the existence of multiple conspiracies, and that prejudice resulting from evidence introduced on the conspiracy count required a new trial on the false statement count; that the Government obtained the superseding indictment, which added the conspiracy count, solely to gain the admission of prejudicial evidence, thereby abusing prosecutorial responsibility and necessitating a new trial on both counts; and that his prison sentence unconstitutionally punished him for demanding a trial. We affirm.

The Bernice Leavitt–Joseph Toonkel Memorial Branch of the American Cancer Society New York Division, Inc. ("Leavitt–Toonkel") raised money for several years by holding casino night dinner dances at hotels in Manhattan. Approximately two weeks before the annual autumn dinner dances, contributors would write checks to the Society. With the connivance of Leavitt–Toonkel fundraising personnel, contributors could pick up cash in an amount equal to 90% of the face value of each check the day before or the day of the dinner dance. Thus, the supposed contributor would donate 10% of the amount of the check, but retain a check to substantiate a claim for a charitable deduction in the check's full amount. The scheme worked so well, with so many contributors contributing such large amounts, that for the 1983 dinner dance $1,450,000 in cash was shipped by armored car to the Pierre Hotel for distribution to the contributors, one of whom was appellant Rooney.

Rooney, an accountant, was then a principal in the brokerage firm of Rooney, Pace, Inc., and he had learned about the scheme in 1980 from his partner, Randolph Pace. Pace advised Rooney that he was writing a personal check and thought they should write a corporate check as well. Pace did so, with Rooney's approval, in an amount of $10,000. After Leavitt–Toonkel returned $9,000 in cash, Pace and Rooney apparently shared the cash by adjusting their respective expense account allowances, and their corporation took a $10,000 deduction.

In 1983 Rooney wrote a $50,000 personal check to the American Cancer Society. The day before the dance, Rooney's chauffeur picked up $45,000 in cash at the Pierre Hotel, where the dance was to be held. On Rooney's 1983 personal income tax return he deducted the full amount of the $50,000 check.

After the Leavitt–Toonkel scheme was reported to the authorities, Rooney attempted to fabricate a defense to the investigation by "reminding" some friends who had participated in the scheme and attended the dinner dance that he had gone to the party, received chips and gambled extensively, making his contribution by losing money. Of course, gambling losses, even those sustained at events run by charitable organizations, are deductible only against gambling gains, but Rooney's argument, had it been founded on the truth, would have been that he had not acted with criminal intent. The trouble was that there was proof that Rooney had not attended the dance, and he could not get his friends to testify otherwise. Moreover, there was proof that at most $21,000 in cash was used to purchase chips at the affair and that Leavitt–Toonkel's total gambling profit for the evening was between $40,000 and $43,000, so Rooney's losing $45,000 was quite unlikely.

## DISCUSSION

### A. *Venue*

Rooney claims first that there was insufficient evidence of venue in the Southern District for the false statement count be-

cause he signed the false tax return and mailed it from Southampton, New York, in the Eastern District. He concedes that the return was prepared by his accountant in the Southern District, but he claims not to have taken an active role in the preparation of the return, arguing that he merely sent all his checks to his accountant, who determined that this particular deduction should be taken. The district court relied on the continuing offense statute, which states that "any offense ... begun in one district and completed in another, or committed in more than one district ... may be ... prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a) (Supp. IV 1986). The court found that the signing of the return completed a crime that had begun with the accountant's preparation of the return in Manhattan. But Rooney argues that his accountant made a wholly independent, albeit erroneous, evaluation of Rooney's financial records, so Rooney did not violate the statute until he read and signed the return in Southampton.

Rooney was convicted of violating section 7206(1) of the Internal Revenue Code, which states that anyone who "[w]illfully *makes and subscribes* any return, statement, or other document ... under the penalties of perjury ... which he does not believe to be true and correct as to every material matter" is guilty of a felony. 26 U.S.C. § 7206(1) (1982) (emphasis added). Rooney emphasizes that section 7206(1) establishes only one manner—"making *and* subscribing," not "making *or* subscribing" —in which it may be violated.

■ We agree with the Seventh Circuit that in a prosecution under section 7206(1) "[v]enue may lie not only where the return was made and subscribed, but also where filed, or where the preparer received information from the defendant even though the defendant signed and filed the returns elsewhere." *United States v. Marrinson*, 832 F.2d 1465, 1475 (7th Cir.1987). We have held that the continuing offense statute applies to section 7206(1) prosecutions, so that venue lies in the district in which a return was prepared and signed even if it

was filed and received elsewhere. *United States v. Slutsky*, 487 F.2d 832, 839 (2d Cir.1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974). We apply here the reasoning previously used in cases involving prosecutions for tax evasion under section 7201:[2] tax return preparation by an accountant is sufficient to create venue if the taxpayer causes the accountant so to proceed, thereby propelling a force into that district. *See United States v. Marchant*, 774 F.2d 888, 891 (8th Cir.1985) (taxpayer "permitted his accountant to carry false information into the [district of prosecution] and there to prepare and attest returns"), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986); *United States v. Gross*, 276 F.2d 816, 820 (2d Cir.) (taxpayer "sent incomplete and therefore untrue and incorrect information to the preparer in [the district of prosecution, and] the preparer thereupon prepared and attested returns in that district, which, while true on the basis of the information given him, were in fact false"), *cert. denied*, 363 U.S. 831, 80 S.Ct. 1602, 4 L.Ed.2d 1525 (1960); *see also United States v. King*, 563 F.2d 559, 562 (2d Cir.1977) (noting in dicta that "the jury could reasonably conclude that the return [which was a false statement] was prepared and/or signed" in the district where the defendant was prosecuted), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978). To the extent that *United States v. Webster*, 803 F.2d 722 (6th Cir.1986) (unpublished opinion; text in Westlaw), disagrees with the foregoing, we disagree with it, noting that the citation of unpublished opinions is "disfavored" under Rule 24(b) of the Sixth Circuit's Local Rules.

We find that Rooney, who resided in Manhattan, listed a Manhattan address on his tax returns, and maintained his corporate offices there, did cause his accountant to prepare the return in Manhattan. At Rooney's behest, his secretary sent copies of all of his cancelled checks to Rooney's accountant's office in Manhattan. The argument that the false statement was not made until Rooney learned about and

---

2. "Any person who willfully attempts in any manner to evade or defeat any tax ... shall ... be guilty of a felony...." 26 U.S.C. § 7201 (1982).

adopted his accountant's treatment of the check is totally farfetched. By instructing his secretary to give the cancelled checks to the accountant, he impliedly represented to his accountant that the $50,000 check to the American Cancer Society was a charitable gift, thereby giving the accountant "incomplete and therefore untrue and incorrect information." *See Gross*, 276 F.2d at 820.

■ Rooney's next argument is that a new trial is required on the false statement count because the district court improperly removed the issue of venue from the jury. This point was waived, however, by trial counsel following the ruling that preparation of the return in Manhattan was sufficient for venue in the Southern District. The accountant had testified that the return was prepared in Manhattan. After the ruling, defense counsel objected to the legal determination that preparation could support venue, but not to the factual finding that preparation occurred in Manhattan. The question whether there was preparation in Manhattan was therefore not preserved for appeal. *See* Fed.R.Crim.P. 30; *see also United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir.) (failure to raise venue at trial constitutes waiver), *cert. denied*, 469 U.S. 918, 934, 105 S.Ct. 297, 332, 83 L.Ed.2d 232, 269 (1984). Thus, Rooney's second venue point is subsumed in his first.

B. *Conspiracy*

Rooney argues that there was a fatal variance between the single conspiracy charged in the indictment and the multiple conspiracies he claims were proved at trial. He argues that there were many small conspiracies involving individual Leavitt–Toonkel contributors and that there was no "rim of the wheel to enclose the spokes" to create a unitary conspiracy. *See Kotteakos v. United States*, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). The "spokes," the argument runs, were not acting with a common purpose, *see United States v. Snider*, 720 F.2d 985, 988 (8th Cir.1983), *cert. denied*, 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984), as each "contributor" sought his own personal gain. But "[w]hether the evidence in a case establishes single or multiple conspira-

cies is a question of fact to be resolved by a properly instructed jury." *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir.), *petition for cert. filed*, 57 U.S.L.W. 3155 (U.S. Aug. 10, 1988) (No. 88–278); *United States v. Carson*, 702 F.2d 351, 358 n. 11 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Rooney concedes that the jury was properly charged on the issue of multiple conspiracies. Judge Stanton instructed the jury that they could return a guilty verdict only if they found that Rooney participated in a unitary conspiracy whose common goal was that stated in the indictment, to "generate documentation in the form of checks payable to the American Cancer Society to reflect bogus donations ... which could then be reported and, where applicable, deducted on federal income tax returns as charitable contributions, when in fact the checks were false and fraudulent in that no more than 10% of the face value of each check was actually donated."

■ Thus, the "only issue ... is the sufficiency of the evidence to support this finding [of a single conspiracy]." *United States v. Heinemann*, 801 F.2d 86, 91 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). There was sufficient evidence that there was one conspiracy with the common goal of generating fraudulent tax return documentation. The Leavitt–Toonkel scheme, with its casino night parties and huge quantities of cash, could not have been conducted without more than one "contributor." All we need to do, then, is to determine "whether it reasonably could be inferred that [Rooney] participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980). There is no requirement that each member of a conspiracy conspire directly with every other member of it, *Friedman*, 854 F.2d at 562, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member, *Alessi*, 638 F.2d at 473. The jury could decide that there was a single conspiracy even though the same people were not involved throughout the entire period, *United States v. Nersesian*,

824 F.2d 1294, 1303 (2d Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). The evidence here established that Rooney was told by his partner, Pace, that the Leavitt–Toonkel scheme existed and was open to new participants. When Rooney asked Pace how to arrange to pick up the $45,000 in cash before the dance, Pace referred him to a mutual friend, Michael Miller, who had given Pace information about the scheme back in 1980. The jury was entitled to infer that Rooney understood that his coconspirators had arranged well in advance to ship large amounts of cash to the Pierre in order to accommodate large-scale "contributors" such as Rooney. There was, then, sufficient evidence to support the jury's finding of one conspiracy.

C. *Superseding Indictment*

■ Rooney argues that the superseding indictment, which added the charge of participation in the Leavitt–Toonkel conspiracy, was simply a procedural ploy designed to secure admission of the 1980 Rooney, Pace, Inc., corporate check and to counter the *in limine* motion Rooney had made to exclude broader proof of the scheme. The argument is that the prosecutor was using the grand jury as a private tool or as a tactical ploy to ease the introduction of evidence. Rooney's argument lacks merit, even if it was properly raised below, which is questionable. *See United States v. Whaley*, 830 F.2d 1469, 1475 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). Prosecutorial vindictiveness claims are for all practical purposes limited to charges added after a trial, as in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and *Thigpen v. Roberts*, 468 U.S. 27, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984). As *Lane v. Lord*, 815 F.2d 876 (2d Cir.1987), put it, there is a "pretrial/post-conviction dichotomy," so that the presumption of prosecutorial vindictiveness only applies when a prosecutor lodges additional charges after a trial. *Id.* at 878; *see also United States v. Hinton*, 703 F.2d 672, 678 (2d Cir.), *cert. denied*, 462 U.S. 1121, 103 S.Ct. 3091, 77 L.Ed.2d 1351 (1983) ("presumption of prosecutorial vindictiveness does not exist in a pretrial setting"). The Supreme Court cases that involved a prosecutor's seeking increased charges in a pretrial setting, *United States v. Goodwin*, 457 U.S. 368, 382–83, 102 S.Ct. 2485, 2493–94, 73 L.Ed.2d 74 (1982), and *Bordenkircher v. Hayes*, 434 U.S. 357, 362, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978), are to the same effect. We also have every reason to believe that the evidence to which Rooney objects would have been equally admissible as proof of Rooney's knowledge and intent under Fed.R.Evid. 404(b) had there been no conspiracy count.

■ Finally, we reject Rooney's claim that the fact that he was the only conspirator in the scheme to receive a prison term demonstrates that he must have been penalized for insisting on his right to a trial. Disparity is generally not reviewable. *United States v. Di Stefano*, 555 F.2d 1094, 1102 (2d Cir.1977). Judge Stanton imposed the four-month sentence because he believed that imposing a fine and requiring community service would be an insufficient deterrent to wealthy defendants such as Rooney; his comment that the defense was "a cock and bull story about gambling the $45,000 away" reflected his belief that Rooney had not accepted responsibility for his actions.

Judgment affirmed.