**UNITED STATES of America, Appellee,**

**v.**

**Edward Ramon MENA,**
**Defendant, Appellant.**

**No. 88–2071.**

United States Court of Appeals,
First Circuit.

Heard March 6, 1991.

Decided May 9, 1991.

of separate housing in their decision to establish a separate household.

Maria H. Sandoval, Santurce, P.R., for defendant, appellant.

Luis A. Plaza, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., was on brief, Hato Rey, P.R., for appellee.

Before BREYER, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Asserting that guilt should not have attached for a hijack that did not succeed or for the empty menace of threatening words backed only by an ersatz bomb that could not explode, defendant-appellant Edward Ramon Mena (Mena) invites us to reverse his convictions for aircraft piracy and related charges. We decline the invitation.

## I. BACKGROUND

We depict the evidence presented at trial in the light most favorable to the prosecution, drawing all reasonable infer-

ences in its favor. *See United States v. Devin*, 918 F.2d 280, 283 (1st Cir.1990); *United States v. Tierney*, 760 F.2d 382, 384 (1st Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

Virgin Islands Seaplane Shuttle Flight 329 left St. Thomas, U.S. Virgin Islands, on June 5, 1987, en route to San Juan, Puerto Rico. The flight carried a complement of seventeen passengers, appellant included, plus the pilot and copilot. Mena had a front row seat. He was dressed in a camouflage outfit and fatigue hat. As the airplane approached the coast of Puerto Rico, Mena strode toward the cockpit, clutching in one hand a tin can equipped with a wick and protruding brass contacts. In his other hand, he held a Bic cigarette lighter. Referring to the can as a "very sensitive explosive device" and continually flicking his Bic, he threatened to "blow up the aircraft" if he was not flown to Cuba.

While ostensibly agreeing to oblige the hijack demand, the pilot explained that the airplane had insufficient fuel to make so long a trip; he suggested they refuel in San Juan, offload passengers to increase flying range, and then "island hop" to Cuba, making additional refueling stops along the way as might be necessary. Mena acquiesced in this plan. Because the aircraft was encountering turbulence, the pilot asked Mena to take a seat lest he drop the bomb and detonate it. Mena sat down, facing sideways, clamping the device between his thighs.

The copilot surreptitiously transmitted an encoded hijack alert through the aircraft's transponder. Upon receiving the signal, the control tower made certain that other airplanes were vectored out of the

way. Flight 329 was given priority to land at the San Juan airport. To allow security personnel time to take their positions, the pilot abjured the normal landing routine, instead taxiing to the end of the runway and back. The pilot kept the wing flaps elevated, thereby signaling that he did not want assistance. He also tried to disable the aircraft by shutting down the fuel line before stopping the engines.[1]

The aircraft stopped at the arrival ramp at about 5:30 p.m. Security personnel surrounded it. The luggage was removed. The passengers and the copilot were allowed to leave. The pilot remained on board for some time and then deplaned. Mena took refuge in the cockpit, communicating with the FBI by means of the aircraft's radio and the control tower. During that interlude, he again warned his rapt audience that he had a bomb and added that he had confiscated a flare gun. He repeated his demand to be transported to Cuba. After more than four hours of negotiations, Mena agreed to disembark. On doing so, he was arrested. The tin can was found to contain a petroleum distillate similar to kerosene.

## II. INDICTMENT, TRIAL, AND ISSUES ON APPEAL

■ We set out the pertinent portions of the statutes of conviction, and related provisions, in the appendix. The grand jury indicted Mena on five counts: (1) committing an act of aircraft piracy in violation of 49 U.S.C.App. § 1472(i)(1) (count one); (2) boarding an aircraft with an explosive or incendiary device in violation of 49 U.S.C. App. § 1472(*l*)(1), (2) (count two);[2] (3) in-

---

1. Inasmuch as the flight to Cuba never took place, it is unclear whether this attempt at aeronautical sabotage was successful.

2. We take this opportunity to rectify an error which has pervaded this case, unnoticed, from the outset. Count two literally referred to "49 U.S.C.App. § 1472(1)(C)(2)", an obvious misnomer. This error was carried forward throughout the proceedings below and maintained by both parties on appeal. Nevertheless, the textual predicate to count two unmistakably describes a violation of 49 U.S.C.App.

§ 1472(*l*)(2). More importantly, the district court, the defense, and the prosecution have at all times treated count two as if it implicated section 1472(*l*)(2). Under the circumstances, the clerical error was harmless. *See* Fed.R. Crim.P. 7(c)(3) ("Error in the citation ... shall not be ground for ... reversal of a conviction if the error ... did not mislead the defendant to the defendant's prejudice."); *see also United States v. Potes*, 880 F.2d 1475, 1477 (1st Cir. 1989); *United States v. Lowe*, 860 F.2d 1370, 1381 (7th Cir.1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989).

terfering with an aircraft's crew in violation of 49 U.S.C.App. § 1472(j) (count three); (4) placing a destructive device aboard an aircraft in violation of 18 U.S.C. § 32(a)(2) (count four); and (5) transporting an explosive in interstate commerce with intent to intimidate in violation of 18 U.S.C. § 844(d) (count five). After a five-day trial, Mena was convicted on all charges except count three.[3] He was sentenced to a mandatory minimum twenty-year prison term on count one and to shorter, but concurrent, prison terms on each of the remaining three counts of conviction.

At trial, the appellant placed most of his chips behind an unsuccessful insanity defense. On appeal, he has jettisoned this approach, instead mounting a multifaceted offensive on a series of other fronts. His most powerful forays attack the propriety of the jury empanelment; the court's failure either to give a lesser included offense instruction linking counts one and two or to afford relief under the Double Jeopardy Clause; the sufficiency of the government's proof concerning the device that was carried on board; and the sufficiency of the proof anent aircraft piracy. We address these issues in inverse order.

## III. SUFFICIENCY OF THE EVIDENCE

Appellant's principal objections are to the sufficiency of the government's proof. Acknowledging that the evidence on count four was ample, appellant challenges each of the remaining counts of conviction. In reviewing any such challenge, our mission is to determine whether "the evidence in its totality, taken in the light most flattering to the government, together with all legitimate inferences to be drawn therefrom [is enough that] a rational trier of facts could have found the appellant guilty beyond any reasonable doubt." *Tierney,* 760 F.2d at 384. We begin with count one, move thereafter to count five, and end with count two.

### A. Aircraft Piracy.

■■■ Count one of the indictment charged appellant with having committed an act of aircraft piracy. The Air Piracy Statute provides that:

the term "aircraft piracy" means any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States.

49 U.S.C.App. § 1472(i)(2). The elements of the offense are, therefore, (1) a seizure of, or exercise of control over, an aircraft, (2) by means of force, violence, or intimidation, (3) with wrongful intent, (4) when the aircraft is within the special aircraft jurisdiction of the United States. *Accord United States v. Dixon,* 592 F.2d 329, 339–40 (6th Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Appellant contends that the government failed to prove these elements beyond a reasonable doubt. He is wrong.[4]

According to the trial testimony, Mena approached the cockpit in mid-flight, dressed in militaristic garb and carrying what he proclaimed was a "sensitive explosive device." He threatened to blow up the aircraft unless he was flown to Cuba. He was flicking his lighter in a way that indicated a willingness to ignite the fuse. Even after receiving false assurances from

---

3. The acquittal was pursuant to a lesser included offense instruction. The lower court told the jury that, if they found Mena guilty under count one, they must acquit him under count three. The correctness of that instruction is not before us (although we note that, at the charge conference, the district judge speculated that he had likely erred in the defendant's favor).

4. In the text, we discuss only the first and fourth elements of the offense, believing, as we do, that the other elements are not legitimately at issue. To the extent that Mena's brief can be read as challenging the evidence on intimi-

dation and/or wrongful intent, it does not bear extended discussion. As clearly appears from the facts set out in Part I, *supra,* a jury could easily have concluded beyond a reasonable doubt that Mena spoke threatening words; that he possessed what would appear to a reasonable observer to be the means to carry out his threats; and that he intended, in this way, to commandeer the aircraft and divert it to Cuba. If the jury chose to draw such conclusions (as, indeed, it seems to have done), then the second and third elements of the offense were solidly proven.

the pilot, Mena did not simply repair to his seat; he sat down sideways, assuming a position from which he could watch both the pilots (fore) and the passengers (aft). At all times, he kept the menacing device prominently in view. Moreover, Mena's actions were not completely unproductive. The crew did not overtly challenge his hegemony. There was also significant disruption of the flight's normal routine: other aircraft were vectored out of the way, an unwonted landing priority materialized, and the ordinary taxi run was prolonged. Although the passengers and crew were able to deplane shortly after arrival, the pilot's departure was delayed. Mena himself appropriated the aircraft's flare gun and remained aboard for several hours, in sole physical control of the aircraft, continually demanding to be taken to Cuba.

Notwithstanding this mountain of evidence, defense counsel has made the best of a difficult climb. First, citing the pilots' coolness under pressure (e.g., alerting the control tower that a hijack was in progress, persuading Mena of the need to land in San Juan, undertaking aeronautical sabotage), she argues that the crew never relinquished control of the aircraft. In a closely related vein, she asseverates that Mena's conduct aboard Flight 329 necessarily fell short of what was required to prove a completed or consummated act of air piracy. Counsel claims that, at most, the evidence established merely an attempt (a crime not charged in the indictment at all). Yet, the foundation of these contentions—counsel's assertion that, in this case, the Air Piracy Statute only criminalizes conduct which occurred while the aircraft was aloft—is set in quicksand.

■ 1. *Special Aircraft Jurisdiction.* To convict a defendant of aircraft piracy, the government must prove that the first three elements of the offense, *see supra* p. 23, were committed "within the special aircraft jurisdiction of the United States." 49 U.S.C.App. § 1472(i)(2). The special aircraft jurisdiction attaches

> while th[e] aircraft is in flight, which is from the moment when all external doors are closed following embarkation until the moment when one such door is opened for disembarkation or in the case of a forced landing, until the competent authorities take over responsibility for the aircraft and for the persons and property aboard.

49 U.S.C.App. § 1301(38). Appellant's claim that his guilt must be judged solely on the basis of his conduct up until disembarkation began depends, therefore, on the assumption that, because the airplane landed when and where it was scheduled to land, no "forced landing" was involved. The assumption is unfounded.

Section 1301(38) was enacted as part of the Antihijacking Act of 1974, coincident with an expansion and refinement of the Air Piracy Statute as a whole. Given this background, we have scant difficulty in concluding that a "forced landing" does not necessarily mean an "unscheduled landing." Where, as here, a pilot lands a hijacked aircraft at a scheduled time and place, but does so subject to the hijacker's permission, ostensibly to refuel for the next leg of the hijacker's jaunt, we think it fair to say that the landing is "forced"—no less so than if the pilot, under precisely the same circumstances, put down to refuel at an airport a few miles away. The appellation seems particularly suitable in a case like this one, where the landing was (1) effected under the baleful eye of the hijacker, who was seated within an arm's reach of the pilot and was clutching what realistically appeared to be (and had been represented as) a bomb; and (2) marked by demonstrable departures from the normal landing routine, attributable to the exigencies of the moment.

■ In adopting this interpretation of section 1301(38), we harmonize the various parts of the statutory scheme by reading the term "forced landing" in *pari materia* with the reference to "force or violence or threat of force or violence" contained in 49 U.S.C.App. § 1472(i)(2). A "forced landing," in short, includes any landing by an airplane laboring under the rigors of an ongoing hijacking, that is to say, laboring under the impetus of force, violence, or intimidation. Such a construction is like-

wise faithful to our earlier opinion in *United States v. Hall*, 691 F.2d 48 (1st Cir. 1982), where we found that the offense—there, interference with a crew member in violation of 49 U.S.C.App. § 1472(j)—lasted not only throughout the time the crew was responding to the episode, but thereafter, until such time as the appellant was physically removed from the airplane. 691 F.2d at 50.

■ In this case, the jury could certainly have found that the landing was "forced," i.e., it would not have occurred in the way that it did had the pilot not been in thrall to the menace which Mena posed. Consequently, the aircraft remained within the special aircraft jurisdiction of the United States until Mena deplaned and "competent authorities t[ook] over the responsibility for the aircraft...." 49 U.S.C.App. § 1301(38). It was, therefore, entirely appropriate for the jury to consider appellant's actions while on the ground in San Juan as direct evidence that he had seized or exercised control over the airplane.[5]

■ 2. *Seizure or Exercise of Control.* If the landing was forced, then the first element of the offense was amply proven; while on the tarmac, appellant can be said to have actually seized, and exercised plenary control over, the aircraft. Even if the landing is viewed as unforced, however, Mena's actions before the airplane landed and "one ... door [was] opened for disembarkation," 49 U.S.C.App. § 1301(38), constituted a seizure or exercise of control alone sufficient to bottom a conviction.

The legislative history behind the statute explains how the definition of aircraft piracy, and the phrasing "seizure or exercise of control", 49 U.S.C.App. § 1472(i)(2), came into existence. The House Report notes:

> The proposed new subsection ... would define the offense of "aircraft piracy".... This is the provision of the bill which is aimed at the acts commonly referred to in the press as the "hijacking" of aircraft. * * * [T]he term "piracy", along with the term "hijacking", has come to be associated with the incidents that have occurred in which individuals, by force or violence or threats thereof, have taken over the control of aircraft and forced the pilot and other flight crew members to do their bidding....

H.R.Rep. No. 958, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Admin.News 2563, 2567. A seizure may be constructive as well as actual. Clearly, Congress did not intend that a wouldbe hijacker must enter the cockpit, supplant the pilot at the throttle, and navigate the aircraft himself in order to have "exercise[d] control" of the aircraft within meaning of the statute. It is enough that the hijacker coerce the crew to do his bidding, by force or intimidation. Hence, we cannot honor appellant's claim of evidentiary insufficiency, forced landing or not.

Without belaboring every nuance in this record, there was evidence to support the following findings: during the flight, appellant presented a threat of extreme violence; the threat was believable when made; the pilot took it seriously; when appellant was apprised of the lack of adequate fuel to reach Cuba, he adopted a plan suggested by the pilot; once adopted, this plan was set in motion; and the aircraft landed to refuel as a step in the hijacker's plot. On these facts, a reasonable jury could have found beyond a shadow of a

5. Even if the touchdown were not a "forced landing," appellant's argument would nonetheless fail. After all, events that occur after an offense has been perpetrated may be relevant in an assessment of what transpired at the earlier time. *See, e.g., Tierney*, 760 F.2d at 387–89 (subsequent events may be probative as to motive at time of earlier action); *Freeman v. Decio*, 584 F.2d 186, 197 n. 44 (7th Cir.1978) (similar). In this case, acts occurring after the aircraft landed had obvious evidentiary significance in establishing what happened during the flight. Thus, the jury was entitled to consider Mena's actions while on the tarmac—reiterating that he had a bomb, continuing to demand that he be flown to Cuba—in deciding whether he had the requisite "wrongful intent" when he approached the cockpit and made his move during the flight. *See, e.g., United States v. Cintolo*, 818 F.2d 980, 989–91 (1st Cir.) (a defendant's intent can be inferred from his conduct, seen in light of all the surrounding circumstances), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); *United States v. Vigil–Montanel*, 753 F.2d 996, 999 (11th Cir.1985) (similar).

doubt that, for some significant amount of time, the pilot's will was overborne and Mena's control over the aircraft had been effected. That Mena was ultimately duped by a pair of quick-witted aviators and thwarted in his efforts to reach Havana does not mean he did not consummate the crime of air piracy.[6]

Appellant's selectively drawn parallels to cases like *United States v. Hack*, 782 F.2d 862 (10th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986), *United States v. Castaneda–Reyes*, 703 F.2d 522 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 174, 78 L.Ed.2d 157 (1983), and *United States v. Figueroa*, 666 F.2d 1375 (11th Cir.1982), are unhelpful. All of those cases involved attempts rather than consummated acts. In each of them, unlike here, a demand or plan to divert an aircraft was halted by the crew, without any significant disruption of the aircraft's normal flight pattern or routine. *See, e.g., Hack*, 782 F.2d at 865; *Castaneda–Reyes*, 703 F.2d at 523. Indeed, in *Figueroa*, which appellant claims involved a situation "strikingly similar" to his own, the putative pirate was an unarmed passenger who never threatened violence, who made his request to be flown to Cuba by handing the flight attendant an apologetic letter (which explicitly stated that "th[e] aircraft [was] in no danger"), and who was arrested without resistance as soon as the aircraft made its scheduled landing. *Figueroa*, 666 F.2d at 1376–77.

Appellant's string citation to a line of cases involving convictions for consummated acts of air piracy, *see, e.g., Dixon*, 592 F.2d 329; *United States v. Busic*, 549 F.2d 252 (2d Cir.1977); *United States v. McNally*, 485 F.2d 398 (8th Cir.1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39

L.Ed.2d 874 (1974), is no more convincing. While it is true that each of these cases involved the actual rerouting of an aircraft to effect an unscheduled landing, there is nothing in any of them—or in the Air Piracy Statute—to suggest that such a diversion is required to establish the element of seizing, or exercising control over, an aircraft.[7] The fact that Flight 329 landed on time at its planned destination neither disproved the fact that an air piracy may have occurred nor barred the jury from reaching the reasonable conclusion that Mena had taken control of the aircraft.

No more need be said. Our review of the record persuades us that it was within the factfinder's province to resolve whatever ambiguities were presented by the actions of Mena and the pilot. The evidence was sufficient to underbrace the guilty verdict.

### B. Explosive or Incendiary Device.

Under count two of the indictment, Mena was convicted of having boarded the aircraft while in possession of a prohibited article, 49 U.S.C.App. § 1472(*l*)(2), namely, a "bomb, or similar explosive or incendiary device," 49 U.S.C.App. § 1472(*l*)(1)(C). Under count five, he was convicted of illegally transporting an "explosive" in interstate commerce, 18 U.S.C. § 844(d). We again take a scriptural approach, *cf.* 1 Matthew 19:30, and consider the two counts in inverse order.

■ 1. *Count Five.* The Arson Statute defines an "explosive" to include *inter alia* "explosive or incendiary devices within the meaning of [18 U.S.C. § 232(5)]." 18 U.S.C. § 844(j). In enacting 18 U.S.C. § 232(5), Congress cast its definitional net

---

**6.** Contrary to Mena's imprecation, the pilot's testimony that, in his opinion, "[t]here was no hijacking" did not mandate a different result. A factfinder is not ordinarily bound by the opinion of a lay witness—or even an expert—especially as to a question that intertwines fact with law. *See, e.g., United States v. Maceo*, 873 F.2d 1, 6–7 (1st Cir.) (it is the jury's role to determine the weight to be accorded to opinion evidence), *cert. denied*, —— U.S. ——, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989). Given the mixed signals sent by the pilot—who also testified that Mena was

"in charge" and that he, the pilot, "couldn't do a damned thing about it"—and the plenitudinous evidence of Mena's actions and threats, the jury could have reasonably inferred that Mena was in control of the aircraft for some measurable intervale.

**7.** Nor, in the obverse, does such a diversion or rerouting necessarily establish that there has been an act of air piracy. *See Hall*, 691 F.2d at 49.

quite widely. There, Congress defined an "explosive or incendiary device" as

any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual alone.

18 U.S.C. § 232(5)(C).

The appellant acknowledges that the expository parameters of section 232(5) control, and that we have heretofore construed the statutory language expansively. *See, e.g., United States v. Stackpole*, 811 F.2d 689, 692–93 (1st Cir.1987) (holding that a ziploc bag filled with Coleman lantern fluid was an explosive device under the Arson Statute). He theorizes, withal, that the apparatus he brought on board was not an explosive because (1) it did not include a "breakable container" and (2) the kerosene-like liquid contained therein was not "flammable." The appellant's first theorem can be readily dismissed. At trial, a prosecution expert testified that, upon examining the device at the airport, he was able to break the aluminum sheet covering the top of the container, thereby furnishing persuasive evidence from which a jury could have deduced that the container was "breakable."

The second theorem is equally unavailing. The appellant presented evidence that the liquid in the container was not "flammable" in the scientific sense of that word, but merely "combustible." The forensic chemist who testified for the government agreed, stating:

Flammable ... [means to me] that the vapors will ignite below one hundred degrees Fahrenheit and [the liquid taken from Mena's device] would not fit this definition.

Be that as it may, we are not disposed to say that flammability, in the technical sense, is a requisite element of the statute of conviction. To the contrary, any theoretical glow sparked by this scientific testimony is easily extinguished by the weight of existing precedent. Relying on the legislative history of the Arson Statute, the Seventh Circuit concluded that "petroleum distillates mixed with air at normal ambient temperatures have an explosive potential" within the meaning of the statute. *See United States v. Agrillo–Ladlad*, 675 F.2d 905, 909 (7th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). To like effect is *United States v. Morrow*, 717 F.2d 800, 803 (3d Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984), where the court specifically held that even a dispersed quantity of kerosene surrounded by combustible materials constituted an incendiary device within the meaning of 18 U.S.C. §§ 232(5) and 844(j). These cases plainly indicate that appellant's device, with a kerosene derivative as its active ingredient, fell within the proscription of the same statutes.

 Any flickers of hope that a different outcome should prevail here are soon doused by a consideration of the statutory structure. "Flammable" is not one of the myriad defined terms in the Arson Statute, *see* U.S.C. § 841 (definitions), and we know of no reason why the word should be given an unnaturally restrictive meaning. In the absence of a statutory definition, it seems to us more likely that Congress used the word "flammable" not in the precise scientific sense, but intending to denote the word's common usage, i.e., "capable of being easily ignited and of burning quickly," *see Webster's Ninth Collegiate Dictionary* 469 (1989). In this instance, the liquid within the container plainly met the lay standard; there was evidence in the record establishing that the kerosene-like liquid in Mena's device would have ignited readily and burned with dispatch had he set fire to the wick. No more was required.

 In reaching this conclusion, we adhere to the time-honored proposition that, when Congress employs statutory terminology "susceptible of one meaning as well as another in the common speech of men, [federal courts] should not stifle a [discernible] policy by a pedantic ... process of construction." *Addison v. Holly Hill Co.*, 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed.

1488 (1944). Rather, unless Congress has pointed the other way, courts should endeavor to read familiar words in the manner that ordinary people would most likely understand. *See id.* at 618, 64 S.Ct. at 1221; *Rosenspan v. United States*, 438 F.2d 905, 911 (2d Cir.), *cert. denied*, 404 U.S. 864, 92 S.Ct. 54, 30 L.Ed.2d 108 (1971). Here, the legislative history belies the suggestion that Congress eschewed the ordinary meaning of "flammable." *See Agrilo–Ladlad*, 675 F.2d at 911 (reviewing legislative history and concluding that it "supports the plain meaning of the language contained in the Act [encompassing 18 U.S.C. § 844(j) ]"). We therefore reject appellant's insistence that an arcane aspect of organic chemistry must predominate over what we discern to be Congress' likely intent.[8]

■ **2. Count Two.** Appellant's challenge to his conviction on this count mirrors his challenge to count five and focuses anew on the technical definition of flammability. Although the correlative of the Air Piracy Statute proscribes boarding an aircraft while in possession of weapons, loaded firearms, explosives, or incendiary devices, 49 U.S.C.App. § 1472(*l*)(1), nowhere does that statute define the terms "explosive" or "incendiary device." While it is arguable that the terms' meanings as used in section 1472(*l*) are broader than under the Arson Statute—a proposition we need not elaborate today—their meanings are certainly no narrower. Since the Arson Statute reached Mena's homemade appliance, *see supra*, the device would *a fortio-*

*ri* come within the parameters of 49 U.S.C. App. § 1472(*l*) as well.

We add only that we think it particularly appropriate to afford the "incendiary device" language of 18 U.S.C. § 1472(*l*)(1)(C) its "common usage" meaning. After all, the Court's pronouncements against perpetuating pedantry at the expense of plainly discernible legislative policies, *Addison*, 322 U.S. at 617, 64 S.Ct. at 1221, zero in on a particularly inviting target in the air piracy milieu. In dealing with air piracy, Congress unmistakably sought "to afford a rational scope for prosecution of suspected hijackers with a minimum of technical barriers." *Busic*, 549 F.2d at 256 n. 7. Like the Second Circuit, we refuse to permit a litigant to impose a "crabbed construction" of a term tied to the statutory scheme and thereby to promote "the precise overtechnicality that Congress explicitly wished to avoid." *Id.* at 258.

We hold, therefore, that the proof was sufficient to permit the jury to convict on count two.[9]

## IV. DOUBLE JEOPARDY; LESSER INCLUDED OFFENSES

Appellant asserts that boarding an aircraft with an explosive or incendiary device is a lesser included offense of air piracy, and thus, his conviction on counts one and two constitutes double jeopardy.[10] He also assigns instructional error on this score. We are unpersuaded.

### A. Double Jeopardy.

■ The Double Jeopardy Clause states that no person shall "be subject for the

---

**8.** We note in passing that the language of 18 U.S.C. § 232(5) encompasses not only an "incendiary" device but any "similar" device. According to the statute, such devices "includ[e]" those containing "flammable liquid," *id.*—but nothing in the statute's text or structure limits the term "similar device" to the specifically described category of appliances. Even if not flammable, Mena's homemade apparatus was certainly close enough in nature to an explosive or incendiary device to qualify as "similar" under the statute. If set alight and thrown, the device could easily have begun a fire that would have caused the small aircraft to crash or explode.

**9.** Ironically, the trial transcript reveals that, in moving for judgment of acquittal on count two,

appellant's counsel not only relied on different grounds in respect to count two, but conceded that Mena's contraption was an "incendiary device" within the purview of section 1472(*l*). Thus, in addition to its other failings, appellant's sufficiency argument anent count two, as presently postured, is procedurally defaulted. *See, e.g., United States v. Argentine*, 814 F.2d 783, 790–91 (1st Cir.1987) (issues not presented below cannot be raised for the first time on appeal).

**10.** The district court did accede to defendant's request for a lesser included offense instruction which required the jury, in effect, to elect between counts one and three. *See supra* note 3.

same offence to be twice put in jeopardy of life and limb ..." U.S. Const. amend. V. This constitutional provision embodies a triumvirate of safeguards, protecting a defendant against (1) a subsequent prosecution for the same offense, after an acquittal; (2) a subsequent prosecution for the same offense, after a conviction; and (3) multiple punishments for the same offense. *See North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *United States v. Ortiz–Alarcon*, 917 F.2d 651, 653 (1st Cir.1990). In asserting that his conviction on count two transgressed the double jeopardy prohibition, the appellant seeks to bring himself within the haven of the "multiple punishment" safeguard. The test enunciated by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), still governs in multiple punishment cases. *See Ortiz–Alarcon*, 917 F.2d at 653–54. That test is as follows:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182.

Here, the offenses were readily distinguishable. Though part of the same statutory scheme, counts one and two each mandated proof of at least one distinctive fact that the other did not. The charge under 49 U.S.C.App. § 1472(i)(1) (count one) required proof that Mena had seized, or exercised control over, an aircraft. The charge under 49 U.S.C.App. § 1472(*l*)(2), incorporating § 1472(*l*)(1)(C) (count two), required proof that Mena boarded an aircraft with a bomb (or similar explosive or incendiary device). A conviction on count one did not require proof that Mena possessed a bomb or kindred appliance; and a conviction on count two did not require a showing that Mena had seized, or exercised control over, an airplane. The mere fact that both counts required proof of some of the same elements (e.g., being on board an aircraft within the "special aircraft jurisdiction")

was inadequate to invoke the Double Jeopardy Clause. By the same token, the fact that in this particular case the incendiary device constituted the means whereby Mena seized control of the aircraft was beside the point. *See Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 2093 n. 12, 109 L.Ed.2d 548 (1990) ("The *Blockburger* test has nothing to do with the *evidence* presented at trial. It is concerned solely with the statutory elements of the offenses charged."); *Iannelli v. United States*, 420 U.S. 770, 786 n. 17, 95 S.Ct. 1284, 1293–94 n. 17, 43 L.Ed.2d 616 (1975) (*Blockburger* may be satisfied "notwithstanding a substantial overlap in the proof offered to establish the crimes"). The simultaneous prosecution of, and multiple punishment for, counts one and two was permissible.

### B. Lesser Included Offense.

██ There is also no merit to appellant's claim that he was entitled to a lesser included offense instruction in connection with counts one and two. In relevant part, the Criminal Rules provide that a "defendant may be found guilty of an offense necessarily included in the offense charged." Fed.R.Crim.P. 31(c). To determine when a lesser included offense instruction is appropriate under Rule 31(c), a court must apply the elements test. *See Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Under this test,

> one offense is not "necessarily included" in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c).

*Id.* at 716, 109 S.Ct. at 1450. As demonstrated above, the elements of count two are distinct from, rather than a subset of, the elements of count one. Knowingly and willfully, and with reckless disregard for the safety of human life, boarding an aircraft with an explosive or incendiary device is not the same as using force, violence, or intimidation to seize, or to exercise control

**30**

over an aircraft. The appellant's contention is baseless. *See id.* at 721–22, 109 S.Ct. at 1453–54 (to constitute lesser included offense, elements must be "identical to" elements of the more serious offense).

## V. JURY SELECTION

 We have saved defendant's opening gambit for last. Because his trial jury was empaneled by a magistrate rather than a district judge, albeit without objection on his part, he claims entitlement to a new trial based on the Court's holding in *Gomez v. United States*, 490 U.S. 858, 871–76, 109 S.Ct. 2237, 2245–48, 104 L.Ed.2d 923 (1989) (under Federal Magistrates Act, presiding at jury selection in a felony trial without the defendant's consent is not a proper office of the magistrate). While a majority of this court has subscribed to the view that the failure to register a contemporaneous objection does not prevent a criminal defendant from successfully raising a *Gomez* claim on appeal, *see United States v. Martinez–Torres*, 912 F.2d 1552 (1st Cir. 1990) (en banc), we have withheld mandate, mindful that the circuits are split, *see id.* at 1554–56 (listing representative cases both ways); that the Court has deadlocked once on precisely this issue, *see United States v. France*, ─── U.S. ───, 111 S.Ct. 805, 112 L.Ed.2d 836 (1991) (per curiam) (affirming judgment of the United States Court of Appeals for the Ninth Circuit, 886 F.2d 223, by an equally divided Court); and that the Court apparently intends to revisit the issue. *See Peretz v. United States*, 904 F.2d 34 (2d Cir.1990), *cert. granted*, ─── U.S. ───, 111 S.Ct. 781, 112 L.Ed.2d 844 (1991). *Peretz* was argued before the Court on April 23, 1991, and is presently under advisement.

In light of the prospect of further guidance, we elect to emulate the example set in *United States v. Gomez–Pabon*, 911 F.2d 847, 852, 863 (1st Cir.1990), *cert. denied*, ─── U.S. ───, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991), where we declined to address the jury selection issue, instead preserving the issue as an open one, deciding the other questions on appeal, and retaining appellate jurisdiction. We follow the same procedure here.

## VI. CONCLUSION

We need go no further. Apart from a question about jury selection, *see supra* Part V—a question which we do not essay to answer today—appellant's assignments of error (including some not mentioned above which, in our estimation, do not merit discussion) are uniformly unavailing. We therefore provisionally affirm his conviction, but withhold mandate and keep open appellant's jury selection claim for the time being, retaining appellate jurisdiction. We will address that aspect of the matter in a subsequent opinion or order after *Peretz* has been decided.

*So Ordered.*

## STATUTORY APPENDIX

The pertinent portions of the relevant statutes read as follows:

**49 U.S.C. § 1472(i) (1988). Aircraft piracy**

(1) Whosoever commits or attempts to commit aircraft piracy, as herein, defined shall be punished—

(A) by imprisonment for not less than 20 years ...

(2) As used in this subsection, the term "air piracy" means any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States.

**49 U.S.C. § 1301(38)(a) (1988). Definitions**

(38) The term "special aircraft jurisdiction of the United States" includes—

(a) civil aircraft of the United States;

while that aircraft is in flight, which is from the moment when all external doors are closed following embarkation until the moment when one such door is opened for disembarkation or in the case of a forced landing, until the competent authorities take over the responsibility for the aircraft and for the persons and property aboard.

**49 U.S.C. § 1472(j) (1988). Interference with flight crew members or flight attendants**

Whosoever, while aboard an aircraft within the special aircraft jurisdiction of the United States, assaults, intimidates, or threatens any flight crew member ... of such aircraft, so as to interfere with the performance by such member ... of his duties or lessen the ability of such member ... to perform his duties, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

**49 U.S.C. § 1472(*l*) (1988). Carrying weapons, loaded firearms, and explosives or incendiary devices aboard aircraft**

(1) With respect to any aircraft in ... air transportation ... whoever—

(C) has on or about his person ... aboard such aircraft any bomb or similar explosive or incendiary device;

shall be fined not more than $10,000 or imprisoned not more than one year, or both.

(2) Whoever willfully and without regard for the safety of human life, or with reckless disregard for the safety of human life, shall commit an act prohibited by paragraph (1) of this subsection, shall be fined not more than $25,000 and imprisoned not more than five years, or both.

**18 U.S.C. § 32(a)(2) (1988). Destruction of aircraft or aircraft facilities**

Whoever willfully—

(2) places or causes to be placed a destructive device or substance in ... any such aircraft ... if such placing or causing to be placed ... is likely to endanger the safety of any such aircraft; shall be fined not more than $100,000 and imprisoned not more than twenty years or both.

**18 U.S.C. § 844(d) (1988). Penalties**

Whoever transports ... in interstate ... commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage ... any vehicle ...

or personal property, shall be imprisoned for not more than ten years, or fined not more than $10,000, or both.

**18 U.S.C. § 232(5) (1988). Definitions**

(5) The term "explosive or incendiary device" means ... (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.