In re Charles **TRAMMELL.**

Gary E. **CARTER, Plaintiff,**

v.

Charles **TRAMMELL, Defendant.**

**Bankruptcy No. 92–14213S.
Adv. No. 93–4508.**

United States Bankruptcy Court,
W.D. Arkansas,
Texarkana Division.

Aug. 18, 1994.

42

G. William Lavender, Texarkana, AR, for plaintiff.

Marc Honey, Prescott, AR, for debtor/defendant.

William S. Meeks, Chapter 7 Trustee, Hamburg, AR.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE is before the Court upon the trial of the complaint to determine dischargeability of debt. The plaintiff Gary Carter is a certified public accountant who practices in Ashdown, Arkansas. Carter previously owned an accounting practice in the Dallas–Fort Worth area, but moved to the Texarkana area to be near his elderly parents. In March of 1988, Carter joined the debtor Trammell's firm, purchasing a one-half interest in that practice for $40,000. $25,000 of that amount was in the form of two promissory notes, the balance paid in cash.[1]

The partnership practice continued from March 1988 until August 1988. Carter, realizing that the two accountants did not perform well together, suggested that one of the parties buy the other's interest. Trammell elected to sell his interest to Carter. In addition, Trammell executed a personal service agreement to assist Carter in servicing certain of the partnership clients for a mutually agreeable period of time.

Under the purchase agreement, Trammell agreed:

---

**1.** At the request of the debtor, the notes were made payable to Trammell's wife, rather than to him. Trammell claimed this was done "for estate purposes."

[T]hat for a period of five (5) years from August 1, 1988, and ending July 31, 1993, except in association with CARTER under personal service contract, he will not perform any accounting or tax services for consideration within a two hundred (200) mile radius of Ashdown, Arkansas. * * *

Under the personal services contract, Trammell would perform accounting work for Carter for the firm's clients, Trammell would record and furnish his time to Carter who would then bill the clients. Upon payment by the client, Carter would remit an agreed percentage to Trammell. For a very short period of time, Trammell performed, albeit reluctantly, in this manner. Carter was required to make significant inquiry to obtain the billing information. Only after such inquiry would Trammell give the agreed-upon information. Often Trammell failed to turn over time records to Carter, but rather, would bring to Carter a personal check represented to be the appropriate payment, less Trammell's percentage.

Often, Trammell failed to provide any information or funds to Carter. This practice was discovered because Carter, although billing good clients, was receiving nothing on the invoices. It was only after Carter inquired of the clients that he discovered that the clients were paying Trammell directly, in contravention of the agreement between the two accountants. Trammell was not reporting time or funds to Carter.

It came to Carter's attention that Trammell was not only doing work for accounting clients, not reporting the funds or accounting for time, but that he also had an advertisement in a local newspaper advertising accounting services. Trammell also was sending letters, when declining work, which recommended persons other than Carter for their accounting work. Trammell was heard to remark to his daughter [2] that "We have to be careful about doing tax returns because of the contract."

In light of the revelations regarding Trammell's breach of the agreement, Carter terminated the personal services contract in March 1989.[3] After termination, Carter learned of more breaches of the agreement, including the fact that Trammell was performing accounting work for the five largest accounts held by the firm, none of the income of which was reported to Carter. After termination of the work relationship, despite his covenant not to compete, Trammell continued to perform accounting services in the Ashdown, Arkansas area.

As a result, Carter instituted suit in the Chancery Court of Little River County, Arkansas seeking an injunction to compel Trammel to abide by the agreements, and to obtain remuneration consistent with the agreements. The Little River County Chancery Court issued an injunction and ordered an accounting. The court determined that Trammell had performed services under the personal services contract, but had failed to account for work performed and income received. The court also found that Trammell violated the covenant-not-to-compete contained in the purchase agreement. More discovery ensued, after which Trammell confessed judgment on December 10, 1992, in the amount of $54,840.58 plus attorney's fees and interest.

The state court provided a method by which Trammell would pay on the judgment: Trammell was to pay a percentage of income from particular sources to Carter. In September 1992, before the judgment was entered, and in an attempt to evade the import of the consent judgment and the court's order, Trammell approached "his" principal

---

**2.** Trammell's daughter is also an accountant, performed accounting work for her father, and, after the partnership agreement terminated, used office space on the firm's premises for her work as an insurance agent.

**3.** Trammell asserts that *he* terminated the agreement after his daughter related a conversation upon which she had eavesdropped. Apparently, Trammell was sufficiently offended by statements made by Carter that Trammell believed he could no longer work with Carter. While this certainly provides a motive for Trammell's subsequent unscrupulous behavior, the determination of who first terminated the agreement is not otherwise a significant fact in this proceeding. Moreover, the Court does not believe that Carter's statements, even if they were uttered, provided "just cause" for his *previous* larcenous acts. Nor are such statements just cause for breaching the covenant-not-to-compete.

client, Carpenter Steel, and offered a deal: Trammell would perform the accounting work for free, but would receive a "loan" from Carpenter Steel.[4] Carpenter Steel would "lend" money to Trammell "until such time as the contract or the commitment would expire." No interest rate was discussed. The express intent of the agreement was to avoid paying anything to Carter pursuant to the judgment.[5]

Carter asserts that Trammell's actions constituted wilful and malicious injury such that the Trammell should not be discharged from his obligation to Carter, pursuant to section 523(a)(6). Trammell admits that a judgment was entered against him, but asserts that the actions were not wilful or malicious.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1334. Moreover, this Court concludes that this is a "core proceeding" within the meaning of 28 U.S.C. § 157(b) as exemplified by 28 U.S.C. § 157(b)(2)(I).

■ The Bankruptcy Code provides that:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for wilful and malicious injury by the debtor to another entity or to the property of another entity.[6]

11 U.S.C. § 523(a)(6). "Wilful" means an intentional act and "malicious" means a wrongful act done without just cause or excuse. *Aetna Casualty & Surety Co. v. Lentine,* 166 B.R. 476 (Bankr.S.D.Fla.1994); *E'Chavarrie v. West,* 163 B.R. 133, 140 (Bankr.N.D.Ill.1993). Malice is demonstrated by evidence that the debtor had knowl-

edge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights. *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989). The resulting harm need not be the primary purpose of the intentional act. *Mirulla v. Langlois,* 163 B.R. 912, 915 (Bankr.D.N.H.1994). Nor is there any requirement that the debtor acted out of personal hatred, spite or ill will. *Lentine,* 166 B.R. at 478; *West,* 163 B.R. at 140. Rather, the focus is upon the debtor's actual knowledge or the foreseeability that his conduct will result in injury to the creditor. *Peel v. Hilliard (In re Peel),* 166 B.R. 735, 739 (Bankr.W.D.Okla.1994). The moralistic notion of the "wrongfulness" of conduct is not the focus of proof under the statute. *Id.*

Thus, to fall within the purview of section 523(a)(6), it is sufficient that (1) Trammell intentionally disregarded the provisions of the agreements, and (2) knowing that the breach would harm Carter, proceeded to act in contravention of the agreements and the obligations they imposed. *See In re Rose,* 155 B.R. 394, 397 (Bankr.W.D.La.1993).

■ It is clear to the Court that, from the date of the making of the contracts, Trammell intentionally acted and employed a scheme to defeat the reasonable financial expectations of Carter. Indeed, the course of conduct is so deliberate and repugnant that Trammell's conduct was not only wilful and malicious within the meaning of section 523(a)(6) of the Bankruptcy Code, but was also malicious in a moralistic sense.

Trammell acted wilfully by failing to abide by the covenants in the personal service contract: he worked for clients Carter had purchased through the purchase agreement within the territorial range of that agreement. He performed accounting and tax ser-

---

4. While for purposes of this trial Trammell asserted he received only loans from Carpenter Steel, rather than income, Trammell did not list such a debt on his bankruptcy schedules.

5. Trammell's assertion that taking the loans in lieu of salary was not done willfully and maliciously is untrue. Indeed, such testimony is in direct contravention to the statement that he took the loans "to protect my own interest." His evasiveness and malice are also demonstrated by statements made during the section 341 meeting.

At that meeting, numerous questions regarding his employment and income were asked of Trammell, to which he responded alternately that he was "not receiving income," but instead was getting "loans" "just for what I need to live on." When asked if the "loans" were tied to services, he responded only that he was "not getting income."

6. "Entity" includes a person. 11 U.S.C. § 101(15).

vices for companies and for individuals who were clients of the firm, and performed services to others. There is no question that such acts were wilful within the meaning of section 523(a)(6). He intended to do those acts and performed those acts, all in contravention of the agreements he voluntarily executed and for which he received substantial sums of money.

Trammell acted maliciously within the meaning of section 523(a)(6). He was fully cognizant of the terms, legal import, and intent of the agreements and of Carter's rights under those agreements. Despite that knowledge, and with those rights in mind, he proceeded to perform accounting and tax work for clients of the firm and for other persons within a 200 mile radius of Ashdown, Arkansas.

Despite the injunction issued by the state court, Trammell never ceased acting in contravention of the agreement. Thus, Trammell also violated an order of the Chancery Court, and from all appearances, continues to do so. Although Trammell agreed to the monetary judgment entered against him, he declared that, with regard to the obligations imposed by the judgment, he "didn't see it that way." This statement exemplifies Trammell's demeanor, perspective, and conduct throughout, from the time he first signed the agreements with Carter: since he didn't personally agree with the terms of the judgment, despite consenting to it, it meant nothing. Likewise, since he did not wish to comply with the agreements, he ignored them, despite the full knowledge of his obligations and the harm that would inure to Carter.

Further evidence of his intent is found in the method by which he sought to evade payment to Carter pursuant to the express terms of the judgment. Trammell testified that prior to becoming an "employee" of Carpenter Steel he earned thirty-five dollars per hour. After purportedly assuming the title of comptroller, he earned $500 per week. When the judgment was to be entered, however, Trammell altered the scheme to earn "loans" instead of "income." Trammell stated that he did not receive income because, "If I receive any income, I've got to pay you

[Carter] 60 percent of it, so I'm not receiving any income. I'm just getting a loan." One month after the time Trammell believed the agreement expired, he reverted to earning thirty-five dollars an hour for work performed on behalf of Carpenter Steel. Trammell implies that there was no improper motive in such a scheme because there was, in effect, no change in status with regard to Carter: he didn't pay him anything before and he didn't pay him anything after. Once again, this demonstrates that Trammell's intent, throughout, was to evade his legal obligations and thereby injure Carter.

 Trammell argues that evidence regarding his actions after October 1, 1992, are not relevant to the issues in this section 523(a) proceeding inasmuch as such acts took place after the time the debt was incurred. Persons who commit fraud, or otherwise act with malice, rarely announce their purpose. A debtor's intent must often be discerned from inferences drawn from a course of conduct. Thus, to demonstrate the requisite intent, motive or wilfulness, a party may introduce evidence to establishing that course of conduct.

The Court finds that the evidence is relevant because it is probative evidence of Trammell's intent and knowledge with regard to the agreement as well as probative of Trammell's wilfulness and malice in the context of his overall scheme to defraud Carter. Subsequent conduct may show a party's state of mind at the time of the conduct at issue. *See United States v. Mena,* 933 F.2d 19, 25 n. 5 (1st Cir.1991) ("Acts occurring after ... had obvious evidentiary significance in establishing what happened during the flight."). Moreover, the evidence of the acts subsequent to the judgment are intertwined with Trammell's conduct prior to entry of the judgment. The subsequent actions of Trammell were part of, and demonstrate a commitment to, a course of conduct of which the accrual of the debt itself is only a part. The evidence of subsequent actions is not merely descriptive of other bad acts, it completes the picture of Trammell's scheme. Thus, the evidence of the later conduct makes the existence of wilfulness and malice more probable than it would be without the evidence.

Even were the Court to disregard all evidence of acts conducted after October 1992, Carter has demonstrated by clear and convincing evidence[7] that Trammell's actions were wilful and malicious such that the debt is nondischargeable. Trammell had the conscious intent to breach the contract and thereby prevent Carter from receiving the benefits of the contract. Thus, even were the evidence of conduct after October 1992 irrelevant, the debt is nondischargeable.

Trammell does not deny that he performed any of the acts which the Court finds to be wilful and malicious. Rather he argues that (1) he took those acts to preserve his own interests, *i.e.*, financial survival; (2) he acted in reliance of advice of counsel; and (3) he was not performing as a "public" accountant such that he did not in fact violate the terms of the agreement.[8]

The Court does not believe that Trammell's actions were made in reliance on advice of counsel. There is no evidence that he even consulted counsel at the time he breached the agreements. Rather, he asserts he acted on reliance of counsel near the time the final judgment was to be entered. He did not rely upon advice of counsel when he diverted clients from Carter in violation of the agreement. He did not rely upon the advice of counsel when he directed clients to pay him rather than Carter. He did not rely upon the advice of counsel when he failed to provide time records so that Carter could properly bill the clients. He did not rely upon the advice of counsel when he failed to turn funds over to Carter pursuant to the agreement. He relied upon his *own* counsel in deliberately breaching the agreement with Carter.

The Court also does not believe Trammell's assertion that his sole motive was "financial survival." Financial survival was not even an issue when he first began breaching the agreements by failing to account for his time, taking money from clients in violation of the agreement, and doing work for the clients without remitting any funds to Carter. At the time he breached the personal services agreement, he was being paid for his interest in the partnership, was receiving a percentage of the work he performed on behalf of the firm, and was employed as a teacher of accounting.

Trammell argues that he did not act wilfully or maliciously in view of his belief that he was not performing as a public accountant, but rather as a private employee. First, this assertion is belied by his own acts and demeanor. The Court does not believe that he made any such distinction at the time he breached the agreements, but rather simply acted out of greed or other bad motive. This is supported by the statement he made to his daughter that he had to "be careful" because of the contract, by his failure to properly account for his time to Carter, by his accepting remuneration from clients of the firm when he was aware that Carter was to bill the clients, and by his demeanor when testifying regarding these matters. Second, the agreement Trammell voluntarily signed prohibited performance of *any accounting or tax services*. The document makes no distinction between being a "public accountant" or an employee. The assertion of such a semantic distinction, in the face of the plain language of the agreement, is further evidence of the wilfulness and malice of Trammell.

It is interesting to note that these defenses rely upon factually inconsistent arguments. For example, he argues that, once the injunction and monetary judgment were issued, he was motivated by concern for his financial survival. Throughout trial, however, he asserted that his actions from the time of the injunction forward are irrelevant to the cause of action under section 523(a)(6). He argues that he relied upon advice of counsel when he became an "employee" and obtained "loans." Again, these acts were performed after the injunction was issued, the time period Tram-

---

7. Trammell asserts that this is the burden imposed by section 523(a). The Supreme Court has ruled otherwise. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Even were that the evidentiary standard, that burden was met.

8. This argument is also barred by the doctrine of collateral estoppel. The state Chancery Court expressly determined that Trammell breached the agreement and enjoined further breaches.

mell asserts is irrelevant to the proceeding. He asserts that once the injunction was issued, he "quit public accountancy," again, focusing on a period of time after he breached the agreements and the damages had accrued.

Finally, the Court finds that Trammell did not present a demeanor consistent with truthfulness. His testimony was confused, contradictory, and unbelievable. As noted by the Tenth Circuit Court of Appeals in *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek* (*In re Pasek*), 983 F.2d 1524, 1527 (10th Cir.1993), there are no absolutes in the determination of wilfulness and malice. "In each case, evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'wilfulness' is present." The Court has examined the debtor's motives, his demeanor, actions, and "justifications" for those actions. Based upon this examination, it is

**ORDERED** as follows:

1. The debt, including attorney's fees and interest, owed to the plaintiff Gary E. Carter, by the debtor, Charles Trammell, is nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(6). A separate judgment will be entered in favor of plaintiff.

2. The Clerk of the Bankruptcy Court is directed to transmit a copy of this opinion to the United States Attorney for the Western District of Arkansas for investigation of internal revenue and/or bankruptcy crimes.

3. The Clerk is directed to transmit a copy of this opinion to the Arkansas State Board of Public Accountancy.

**IT IS SO ORDERED.**